By the Court.—Gildersleeve, J.
The defendant, the Coney Island Jockey Club, is a corporation existing under the laws of the State of New York, owning what is known as the Coney Island race track, and is engaged in the business of running thoroughbred horses over its course at said track for stakes and purses.
Among the stake races, arranged by the defendant, is a race known as “ The Futurity.” The entries of contestants for this race are made before the contesting horses are born. The owner of a mare in foal enters the unborn foal of such mare, to be run at the age of two years.
In the year 1888, pursuant to the provisions and conditions of said race, one General Jackson, the owner of “ Belle Meade Stud Farm,” of Nashville, Tennessee, entered for the said race the unborn foal of a certain thoroughbred mare, known as “ Brunette,” by the thoroughbred running horse “Iroquois.” This foal *395 was bom in the spring of 1889, and was named ££ Huron.”
The plaintiff is engaged in the business of breeding, purchasing and running horses for purses and stakes ; and, on the 21th day of April, 1890, purchased the said colt ££ Huron ” at public auction.
It is manifest that if the plaintiff has a cause of action here against the defendant, it has its basis in the rights that he acquired by the purchase of the said colt “ Huron.” Our first inquiry, therefore, is: What rights in respect of “ The Futurity ” race did the plaintiff get by his said purchase ?
It is the contention of the plaintiff that the colt “ Huron ” was sold “ with all of his racing engagements,” among which was “ The Futurity ; ” and that by means of this purchase of the colt he became entitled to run the said colt in “ The Futurity ” race on August 29, 1891. It must be conceded that, at the time of the sale, in April, 1890, the said colt was eligible as a competitor for ££ The Futurity.” In the catalogue of sale, he was described as <£ Eligible to Coney Island Futurity, 1891.” We do not understand that any claim is made to the contrary.
We agree with the learned court below that this announcement of the. colt’s eligibility in respect to ££ The Futurity ” race meant that he was ££ legally qualified to enter into it.” The question to be met, however, is this : Was he sold with this engagement?
This right or privilege, called an engagement, had its origin in a contract entered into between General Jackson, the owner of ££ Belle Meade Stud Farm,” and the defendant; and it cannot be enforced, except in pursuance of the terms and conditions of that contract. If, by the purchase, the plaintiff became the owner of the colt’s engagements, and succeeded to the rights of General'Jackson, he, in his efforts to enforce those rights, must submit to the rules of the defendant, under *396 and subject to which the contract was originally made.
Rule 61 of defendant provides that when the horse is sold at public auction, the advertised conditions of the sale are sufficient evidence that he was sold with his engagements. As we read the catalogue of the sale, we do not understand the words “ Eligible to Coney Island Futurity, 1891, Brood Mare, Sweep Stakes, Westside Park, Nashville, 1891,” as constituting one of the conditions of the sale. It was a portion of the description of the colt, and a statement of the possibilities that a purchaser might realize. The conditions of the sale, as published in the catalogue, were set forth in five paragraphs, numbered respectively from first to fifth, and contain no reference whatever to the engagements of the colt “ Huron ” or any other horse. In the conditions of sale, no engagements are specified, as provided for by “ Section 61, rules of racing, regulations of the course and betting rules,” adopted by the defendant, and in force at the time the contract under consideration was entered into between General Jackson and the defendant. We fail to find any evidence in the record to support the conclusion that the colt “ Huron ” was sold with his engagements.
We cannot agree with the learned court below that the statement “Eligible to Coney Island Futurity, 1891,” in the description of the colt “ Huron,” can be read in with the conditions of the sale and operate - as a declaration by the vendor that the colt “Huron ” was sold with his engagements. We think that it cannot even be said that a representation as to the eligibility to the Futurity race was one of the conditions of sale. Could it be given an interpretation so elastic, it would certainly be unreasonable to make the further claim that this description meant a sale of the colt with his engagements.
Had it been the intention of General Jackson that the *397 sale of the horses in question should be with their engagements, it was a condition so easily expressed that we are justified in assuming that it would have been set forth in the catalogue with perfect clearness. The engagements of a race-horse constitute an important factor with purchasers in placing an estimate upon his value, and is a feature of the business that receives important, and not slight, consideration. Again, the owner of the “ Belle Meade Stud Farm ” had good reasons for not selling his horses at public auction with their engagements. The sale was a large one. If the horses were sold with their engagements, he, General Jackson, remained liable for forfeits which would amount to a large sum, and would entail much trouble and possibly great loss. Purchasers, having bought horses eligible for certain races, could readily, by private treaty with the vendor, in accordance with the rules adopted by the defendant and other racing associations, secure all rights to engagements which the vendor had.
The letter of May 4, 1890, to the secretary of the defendant by Mr. Carter, General Jackson’s agent, declaring the colt “Huron” out of “ The Futurity ” for 1891, supports, with much force, the contention of the defendant that the colt was not sold with his engagements. If he was sold with his engagements, then the vendor, a few days after having made the sale, assumed authority over the engagement, with which he had just parted,—a very unreasonable and improbable act for the proprietor of such a large establishment as “Belle Meade Stud Farm.”
Furthermore, the letter of May 11, 1891, by Mr. Kuhl to the secretary of the defendant, and the telegram, of May 16, 1891, to the secretary of the defendant from the plaintiff, indicate very clearly that if the plaintiff did buy the colt “Huron” with his engagements, he did not know it: If credit is to be given to Mr. Carter’s affidavit, we have direct proof that “ The Futurity ” en *398 gagement of the colt “ Huron ” was the subject of negotiations between the vendor and plaintiff, and resulted in the plaintiff’s declining to assume the engagement.
If, however, the plaintiff did purchase the colt “ Huron ” with his engagements, and succeeded to all the rights of General Jackson in respect to the colt and the “ Futurity ” race, and there was a question whether the plaintiff had or had not a right to run the said colt in the “ Futurity” race of 1891, the executive committee of the defendant were the final arbiters. The executive committee of the defendant-corporation decided that the said colt “ Huron ” was not eligible to start in the “ Futurity ” race of 1891, and that decision this court will not overturn.
One of the rules in force when the original contract was made, knowledge of which the vendor of the said colt will be presumed to have had, is as follows: “ If any case occur, which is not, or which is alleged not to he, provided for by these rules, it shall be determined by the executive committee, in such manner as they think best and conformable with the usage of the turf.”
The executive committee of the defendant-corporation in denying the right of the plaintiff to run the said colt “ Huron ” in said race, so far as appears, acted in good faith and had sufficient evidence before them to sustain their conclusion.
Courts of equity rarely interfere with the exercise of discretionary powers by corporate bodies or their officers, to whom such powers are confided. Where acts requiring the exercise of judgment, science or professional skill are confided to the discretion of the officers of a corporation, the exercise of that discretion will not be lightly disturbed; nor will such officers be enjoined, except when abusing their power to the injury of others. See Walker v. Mad. Riv. Co., 8 Ohio, 38; Cooper v. Williams, 4 Ib., 253; High on Injunctions, § 763.
Executive committees of jockey clubs and social clubs *399 are supreme within themselves, when within the scope of their recognized authority ; and where there is any evidence, and the party concerned has an opportunity to be heard, in the absence of fraud, courts should not interfere with their decisions.
When the original contract was entered into, which secured to the owner of the colt “Huron” whatever rights existed in respect to the “ Futurity ” race, the owner of the said colt, in effect, subscribed to the defendant’s rules, and they are binding upon his successor. Those rules named the tribunal to which any dispute, that might arise out of the contract, should be submitted. That tribunal was the executive committee of the defendant-corporation. They had jurisdiction of the cause of action alleged in the complaint herein, and it was the duty of the plaintiff to submit to their decision.
The statute laws of this State give the defendant the right to conduct races at certain specified times. The right to settle controversies, like the one in question, is just as firmly established, though it rests upon a different foundation. It has the support of sound principles of equity, declared in a long line of authorities.
The plaintiff, having rested quietly for over a year and after hundreds had acted upon the situation as it then existed, came forward at the last moment, and demanded an entrance for his horse. His demands could not have been granted, without doing great injustice to other competitors and to patrons of the turf generally.
We are of the opinion that the executive committee of the defendant-corporation were fully warranted in the course that they pursued.
The order appealed from should be reversed, and the injunction dissolved, with costs and disbursements to the defendant.
Freedman, P. J., and Dugro, J., concurred.